|   |   |   |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | UNITED STATES DISTRICT COURT | |
| 9 | WESTERN DISTRICT OF WASHINGTON AT SEATTLE | |
| 10 | ZACHARY GRALING, | CASE NO. C24-1798 MJP |
| 11 | Plaintiff, | ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE |
| 12 | v. | |
| 13 | UNITED SERVICES AUTOMOBILE ASSOCIATION, | |
| 14 | | |
| 15 | Defendant. | |

This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. No. 17) and Motion to Exclude (Dkt. No. 20). Having reviewed the Motions, the Oppositions (Dkt. Nos. 23 & 25), the Replies (Dkt. Nos. 28 & 29), and all supporting materials, the Court DENIES in part and GRANTS in part both Motions.

**BACKGROUND**

In March 2024, Plaintiff Zachary Graling was injured when his stationary car was struck head-on by an uninsured hit-and-run driver who was entirely at fault. (Complaint ¶¶ 2.1-2.3 (Dkt. No. 1-3); Declaration of Nick Major Ex. 2 at 7 (noting nature of collision) (Dkt. No. 24-

2).) Graling was insured by Defendant United Services Automobile Association[1], and his insurance policy provided $10,000 in personal injury protection (PIP) and up to $25,000 in underinsured motorist (UIM) coverage. (Id. ¶¶ 2.4, 2.6; Declaration of Rishabh Agny Ex. E (Dkt. No. 18-5).) USAA has paid out all $10,000 in PIP coverage and offered $16,505 to settle the UIM claim. But Graling has demanded the $25,000 policy limits and asserts that USAA has engaged in bad faith and mishandled his claim. Below, the Court reviews the relevant facts, including the timeline of the back-and-forth between Graling's attorney and the USAA claims handler.

**A.     Graling's Injuries, Treatment, and Impacts to Work/Life**

Immediately after the collision, Graling sought treatment from his primary care physician, who diagnosed him with a strained neck muscle, thoracic myofascial strain, arthralgia of the right knee, and episodic headaches. (Agny Decl. Ex. A.) The physician referred Graling for chiropractic care. Three days after seeing his physician, Graling began treatment with Dr. Andrew Hamilton, DC at Dynamic Chiros. (Id.; Declaration of Luis Menchaca ¶ 3 (Dkt. No. 19).) At his first visit with Dr. Hamilton, Graling provided a subjective report of his symptoms, showing a functional impairment of 80%. (Agny Decl. Ex. A at 6 (Dkt. No. 18-1 at 6).) But by June 2024, Graling provided a new subjective report, showing only a 7% functional impairment. (Id. at 12.) Graling made this report after he obtained 34 chiropractic visits, 18 acupuncture visits, and 12 massage visits. (Major Decl. Ex. 2 at 7.) Graling did not seek the physical therapy

---

[1] Defendant suggests that Plaintiff improperly named USAA, when the correct party is Garrison Property and Casualty Insurance Company. (Def. MSJ at 1 n.1.) The Court uses USAA for ease of reference and will resolve any dispute over Defendant's name discrepancy through the pretrial process.

2).) Graling was insured by Defendant United Services Automobile Association[1], and his insurance policy provided $10,000 in personal injury protection (PIP) and up to $25,000 in underinsured motorist (UIM) coverage. (Id. ¶¶ 2.4, 2.6; Declaration of Rishabh Agny Ex. E (Dkt. No. 18-5).) USAA has paid out all $10,000 in PIP coverage and offered $16,505 to settle the UIM claim. But Graling has demanded the $25,000 policy limits and asserts that USAA has engaged in bad faith and mishandled his claim. Below, the Court reviews the relevant facts, including the timeline of the back-and-forth between Graling's attorney and the USAA claims handler.

**A.     Graling's Injuries, Treatment, and Impacts to Work/Life**

Immediately after the collision, Graling sought treatment from his primary care physician, who diagnosed him with a strained neck muscle, thoracic myofascial strain, arthralgia of the right knee, and episodic headaches. (Agny Decl. Ex. A.) The physician referred Graling for chiropractic care. Three days after seeing his physician, Graling began treatment with Dr. Andrew Hamilton, DC at Dynamic Chiros. (Id.; Declaration of Luis Menchaca ¶ 3 (Dkt. No. 19).) At his first visit with Dr. Hamilton, Graling provided a subjective report of his symptoms, showing a functional impairment of 80%. (Agny Decl. Ex. A at 6 (Dkt. No. 18-1 at 6).) But by June 2024, Graling provided a new subjective report, showing only a 7% functional impairment. (Id. at 12.) Graling made this report after he obtained 34 chiropractic visits, 18 acupuncture visits, and 12 massage visits. (Major Decl. Ex. 2 at 7.) Graling did not seek the physical therapy

---

[1] Defendant suggests that Plaintiff improperly named USAA, when the correct party is Garrison Property and Casualty Insurance Company. (Def. MSJ at 1 n.1.) The Court uses USAA for ease of reference and will resolve any dispute over Defendant's name discrepancy through the pretrial process.

that Dr. Hamilton prescribed, and did not obtain medical care after June 2024. (Agny Decl. Ex. C at 5.)

At the time of the incident, Graling was employed as a paraeducator by Aequor. (Agny Decl. Ex. A at 1.) Dr. Hamilton authorized Graling to be absent from work due to his injuries from March 18, 2024 to April 22, 2024—a total of five weeks. (Declaration of Nick Major Ex. 4 (Dkt. No. 24-4).)

Graling maintains that he intended to work at an Amazon warehouse "moving the boxes" during the summer of 2024, but felt unable to do so because he was still recovering from the collision. (Deposition of Zachary Graling at 70-71 (Dkt. No. 18-3).) Although Graling did not apply for the job, he believed he would have been hired because "it's one of the positions that I've never seen someone not get, and then with my experience with them[.]" (Id. at 71.) Graling had previously been employed as an "Associate 1" at an Amazon warehouse, though it is not clear when. (See id. at 70-71.) As to the specifics of the job, Graling produced in litigation a screenshot taken in 2021 of a job listing for "Fulfillment Center Warehouse Associate" at Amazon in Kent, which shows an hourly wage of $20.80. (Agny Decl. Ex. A at 14.) The document does not show what the job duties were or the hiring requirements.

Graling has not identified any contemporary opinion from a treatment provider that he could or should not work at the Amazon warehouse over the summer of 2024. Instead, he has provided an expert report produced by Dr. Hamilton for this litigation in which he opines that given the nature of the injury and the description of the Amazon warehouse position, "this occupation would of [sic] placed [Graling] at a high risk for exacerbation of his accident related conditions and unreasonable duress." (Major Decl. ISO Opp. to Mot. to Exclude Ex. 1 ("Second Major Decl.") at 8 (Dkt. No. 26-1).) At the time Dr. Hamilton was treating Graling, however, he

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 3

did not form any personal opinion about whether Graling could work at Amazon over the summer, as he was not aware of Graling's intent to do so. (Hamilton Dep. at 66-67 (Agny Decl. ISO Mot. to Exclude Ex. 2 ("Second Agny Decl.") (Dkt. No. 21-2).) Instead, Dr. Hamilton bases his opinion on Graling subjective beliefs and the screenshot of the job listing from 2021. (Id.) And there is no evidence in the record that Dr. Hamilton or any provider placed any restrictions on future work when he ceased treatment with Graling in June 2024.

### B. Handling of Graling's Insurance Claim

Though the record is unclear whether he acted alone or through counsel, Graling filed a claim with USAA for PIP and UIM benefits. USAA appointed Luis Menchaca as the claims adjuster. Menchaca had more than ten years in third-party claims adjustment, and began handling UIM claims for USAA in December 2023. (Deposition of Luis Menchaca at 22-23 (Major Decl. Ex. 1 (Dkt. No. 24-1)).) Graling sought $12,825 for his medical special damages, and his counsel demanded the UIM policy limits of $25,000. (Menchaca Decl. ¶ 3.) USAA paid the full $10,000 PIP benefits, and they are not at issue except as an offset to the UIM claim. (Menchaca Decl. ¶ 6.) The Court also notes that USAA discounted the medical specials by $219.50, based on the third-party review by a physical therapist who believed that use of hot/cold packs after 4 weeks was not medically necessary, as were certain charges for massage therapy. (Major Decl. Ex. 3 (Dkt. No. 24-3).) Menchaca relied on the third-party review and did not question the reductions. (Menchaca Dep. at 93-94.)

On July 18, 2024, Graling's attorney contacted USAA to demand the $25,000 UIM policy limits, and notified Menchaca that Graling had a five-week work excuse from Dr. Hamilton. (Declaration of Nick Major Ex. 2 (Dkt. No. 24-2 at 1).) The claim file notes that on July 29, 2024, Graling's counsel again demanded UIM policy limits and demanded a response by

August 16, 2024. (Id. at 11 (Dkt. No. 24-2 at 11)).) On August 13, 2024, Menchaca then offered $9,610.00 to settle the UIM claim, though he explained he would consider more information to support the request for the policy limits. (Id. at 9.) Counsel for Graling rejected the offer and told Menchaca that "we will be suing USAA for bad faith" and gave him until "the end of the week to change your position." (Declaration of Rishab Agny ISO Reply to MSJ Ex. 3 (Dkt. No. 30-3) ("Reply Agny Decl.").)

On September 10, 2024, counsel for Graling sent an IFCA notice to USAA, indicating the intent to file suit. The notice included the following statement: "To avoid litigation, our client will accept a settlement of $37,980, representing three times our client's actual damages and $9,750.00 for reasonable attorneys' fees incurred." (Major Decl. Ex. 5 (Dkt. No. 24-5 at 2).) $37,980 represents three times the medical special damages of $12,660. Missing from the request was any amount due for the lost wages Graling now seeks or general damages. On September 11, 2024, Menchaca increased the offer to $11,600. (Agny Decl. Ex. G (Dkt. No. 30-7).) Notes from the claim file Menchaca made report that he offered to increase the UIM claim if counsel provided more support. (Major Decl. Ex. 2 at 10-11.) On September 12, 2024, counsel for Graling rejected the offer, and explained, with no supporting evidence, that Graling had lost five weeks of wages from Aequor and suggested that Graling had foregone working at an Amazon warehouse during the summer. (Agny Decl. Ex. G (Dkt. No. 30-7).) Counsel also explained that Graling had general damages, which he identified as being afraid to drive to both work and to socialize, and other negative impacts to his mental health. (Id.) In response, Menchaca asked for supports for the claimed lost wages, but made no inquiry as to the noneconomic damages. (Id. Ex. H (Dkt. No. 30-8).) Menchaca's claim file shows the general damages were evaluated to have a low of $7,000 and a high of $10,000 as of August 13, 2024. (Major Decl. Ex. 2 at 3-4.)

On September 18, 2024, counsel provided a redacted screen shot of some of Graling's payment from Aequor, which only noted the dates of payment and the fact that his take home pay was 77% of the gross due to taxes and benefits. (Agny Decl. Ex. J (Dkt. No. 30-10).) Following some back and forth, Menchaca asked for an unredacted version that would show the employer, the wage rate, and hours worked so he could verify the amounts counsel claimed. (Agny Decl. Exs. I & K (Dkt. Nos. 30-9 & 30-11).) Counsel then provided an unredacted copy of the same screenshot of Graling's Aequor employment. (Agny Decl. Ex I (Dkt. No. 30-11).)

Menchaca found the request for the lost wages from Graling's work at Aequor to be reasonable. (Major Decl. Ex. 2 at 8.) But Menchaca reduced the total gross wages of $4,875 by 20% (to $3,900) "to account for the net amount Plaintiff would have received." (Menchaca Decl. ¶ 4.) At his deposition, Menchaca explained that it is company policy to reduce the gross wages to the net amount, though he did not know specifically why this was the method to identify the amounts USAA should owe. (Menchaca Dep. at 107 (Dkt. No. 24-1).) Menchaca also incorrectly believed that Graling worked at Amazon at the time of the incident. (Major Decl. Ex. 2 at 8 (Dkt. No. 24-2); Menchaca Dep. at 97 (Dkt. No. 24-1).)

Menchaca did not authorize payment for Graling's claimed missed work opportunity at Amazon. Notably, neither counsel nor Graling provided documentary support for the missed work during the claims adjustment process. During his deposition, Menchaca explained that he denied the request "because there was no supports of those future lost wages." (Menchaca Dep. at 110.) When pressed by counsel, he was unable to articulate precisely what support would have been sufficient to show the lost wages—just "some type of support that the information is correct." (See id. at 110-12.) In discovery, all Graling has provided concerning this job is a 2021 screenshot of a "Fulfillment Center Warehouse Associate" at Amazon in Kent, which shows an

1  hourly wage of $20.80. (Agny Decl. Ex. A at 14.) Based on this, Graling's counsel believes he

2  missed out on $9,984.00 for work over twelve weeks at $20.80/hour. (Pl. Opp. at 8.)

3        Ultimately, on September 26, 2024, Menchaca increased the offer to $16,505 to reflect

4  the lost wages from Aequor. (Agny Decl. Ex. E at 55.) But counsel rejected the offer. Graling

5  filed suit on October 3, 2024 in King County Superior Court. (Compl. (Dkt. No. 1-3).) USAA

6  then removed the case on October 31, 2024. (Notice of Removal (Dkt. No. 1).)

## ANALYSIS

### I.    MOTION FOR SUMMARY JUDGMENT

#### A.    Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(1). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323-24.

1  **B.     Bad Faith**

2      Though Graling's bad faith claim is thin, the Court finds he has identified disputed

3  material facts that preclude summary judgment.

4      "[A]n insurer has a duty of good faith to its policyholder and violation of that duty may

5  give rise to a tort action for bad faith." Smith v. Safeco Ins. Co., 150 Wn.2d 478, 484 (2003)

6  (citing Truck Ins. Exch. v. Vanport Homes, Inc., 147 Wn.2d 751, 765 (2002)). "[A]n insurance

7  company's duty of good faith rises to an even higher level than that of honesty and lawfulness of

8  purpose toward its policyholders: an insurer must deal fairly with an insured, giving equal

9  consideration in all matters to the insured's interests." Tank v. State Farm Fire & Cas. Co., 105

10 Wn.2d 381, 386 (1986). "[A]n insured may maintain an action against its insurer for bad faith

11 investigation of the insured's claim and violation of the CPA regardless of whether the insurer

12 was ultimately correct in determining coverage did not exist." Coventry Assocs. v. Am. States

13 Ins. Co., 136 Wn.2d 269, 279 (1998) (noting the duty to "fully and fairly investigate the claim").

14 "To succeed on a bad faith claim, the policyholder must show the insurer's breach of the

15 insurance contract was unreasonable, frivolous, or unfounded." Smith, 150 Wn.2d at 484 (citing

16 Overton v. Consol. Ins. Co., 145 Wn.2d 417, 433 (2002)). "Claims by insureds against their

17 insurers for bad faith are analyzed applying the same principles as any other tort: duty, breach of

18 that duty, and damages proximately caused by any breach of duty." Id. at 485. "Whether an

19 insurer acted in bad faith is a question of fact." Id. at 484 (citing Van Noy v. State Farm Mut.

20 Auto. Ins. Co., 142 Wn.2d 784, 796 (2001)).

21     UIM claims present a slightly nuanced gloss on the duty of good faith because the

22 relationship between a UIM insurer and its insured "is by nature adversarial and at arm's length."

23 Ellwein v. Hartford Acc. & Indem. Co., 142 Wn.2d 766, 779 (2001), as amended (Jan. 18, 2001),

24

and overruled on other grounds by Smith, 150 Wn.2d 478 (quotation and citation omitted). A UIM insurer stands in the shoes of the tortfeasor and may assert liability defenses, just as the tortfeasor may. See id. at 780. But "[a]lthough the relationship between the insurer and the insured in the UIM setting is, by nature, adversarial, the duty of good faith and fair dealing applies because the insured retains the 'reasonable expectation' that he or she will be dealt with fairly and in good faith by his or her insurer." Ki Sin Kim v. Allstate Ins. Co., 153 Wn. App. 339, 362 (2009), as amended (Jan. 6, 2010) (quoting Ellwein, 142 Wn.2d at 780).

Graling has identified limited, material facts that a jury might find sufficient evidence that Menchaca's refusal to offer policy limits was unreasonable and not the product of a full and fair investigation. Notably, Menchaca did not perform any investigation of Graling's request for general damages, despite being given information from counsel in September 2024 about the incident's negative impacts on Graling's mental health and ability to drive and socialize. (Agny Decl. Ex. G (Dkt. No. 30-7).) The claim file notes Graling's complaint that he "became depressed since he could not socialize with friends due to injuries and he was having trouble driving again after accident." (Major Decl. Ex. 2 at 8.) And yet, Menchaca did not apparently investigate the issue further. And in his deposition, Menchaca explained his investigation of Graling's general damage was to "review[] the medical records that were submitted, the type of accident that was had, the severity of the impact, the -- his treatment, his recovery, his age." (Menchaca Dep. at 71.) Menchaca admitted he could have asked Graling about how the accident negatively affected Graling, but he did not—instead stating "since you [counsel] were representing him, I did not speak to him regarding his injuries or the accident itself." (Id. at 72.) Menchaca also did not alter the $7,000 to $10,000 range approved for the general damages as of August 2024 even with the information he was given in September. (See Major Decl. Ex. 2 at 3-

4 (Dkt. No. 24-2 at 3-4).) Construing this record in Graling's favor, a jury could find that Menchaca's evaluation of the general damages request was unreasonable and not the product of a full and fair evaluation of the general damages.

Graling also correctly notes that a jury might find Menchaca's reduction to the lost wages to be evidence of bad faith. Menchaca reduced the total gross wages of $4,875 by 20% (to $3,900) "to account for the net amount Plaintiff would have received." (Menchaca Decl. ¶ 4.) But Menchaca has not identified why the 20% reduction was proper. At his deposition, Menchaca explained that USAA policy to reduce the gross wages to the net amount, though he did not know specifically why this was the method to identify the amounts USAA should owe. (Menchaca Dep. at 107 (Dkt. No. 24-1).) And the reduction itself does not track the pay information Graling received, which shows a 14% withholding for taxes and an additional 9% for "benefits." (Dkt. No. 18-12 at 3.) Nor has USAA identified any reason why an insurer would correctly withhold taxes from a UIM benefit payment, when it is the insured, not the insurer that has the ultimate duty to report and pay any taxes. A jury could find this reduction to be arbitrary and evidence of bad faith.

Construing this evidence in Graling's favor, the Court finds that it suffices to raise a dispute of fact on the bad faith claim that prevents summary judgment. The Court therefore DENIES the Motion as to this claim.

In so ruling, the Court notes two limits to Graling's claim going forward.

First, Menchaca's refusal to include payment for the allegedly missed Amazon job cannot form the basis of a bad faith claim. Graling provided no information to Menchaca during the claims handling process that would have allowed Menchaca to determine whether Graling could have worked at Amazon, but was precluded because of the incident. Graling did not provide the

1  job listing, a job description, past pay information, or any medical opinion concerning the
2  reasonableness of employment. And even if Menchaca was given the screenshot of the 2021 job
3  listing that Graling belatedly produced in discovery, it does not show any of the job duties or any
4  reason why Graling could not work in the position. Nor does the dated document support the
5  wage rate, as it was three years out of date. Simply put, the loss of the Amazon job cannot
6  sustain this or any of the claims Graling pursues.
7      Second, Graling has not provided any reason why Menchaca could not rely on the third-
8  party medical reviewer to discount the claimed medical bills. Menchaca reasonably relied on the
9  reviewer, and Graling has not identified any law or statute that would have required Menchaca to
10 obtain yet another opinion as to the reasonableness of the medical costs. And Graling has
11 provided no evidence to suggest the disputed costs were improperly removed from the special
12 damages calculation. The reduction therefore cannot form the basis of the bad faith claim going
13 forward.

**C.    IFCA**

15     The Court finds disputed material facts preclude summary judgment on Graling's IFCA
16 claim.
17     IFCA allows an insured who is "unreasonably denied a claim for coverage or payment of
18 benefits by an insurer [to] bring an action in the superior court of this state to recover the actual
19 damages sustained." RCW 48.30.015. IFCA provides a list of WAC violations that give rise to
20 treble damages or to an award of attorney's fees and costs. RCW 48.30.015(5). As is relevant
21 here, the WAC violations Graling cites to includes "[r]efusing to pay claims without conducting
22 a reasonable investigation." WAC 284–30–330(4). Insureds have no private cause of action
23 under IFCA against insurers for violating the Washington regulations. Perez-Crisantos v. State
24

Farm Fire & Cas. Co., 187 Wn.2d 669, 683 (2017). "The insured must show that the insurer unreasonably denied a claim for coverage or that the insurer unreasonably denied payment of benefits. If either or both acts are established, a claim exists under IFCA." Id. (citation and quotation omitted).

Material facts remain in dispute whether USAA unreasonably refused to pay the policy limits for the UIM claim and violated IFCA. First, as explained above, material facts remain in dispute as to whether Menchaca adequately investigated the full extent of Graling's general damages. Second, as is also explained above, Menchaca applied what might be found to be an arbitrary reduction to the lost wages claim in violation of IFCA. A jury must determine whether these acts and USAA's refusal to pay the policy limits was unreasonable and in violation of IFCA. Accordingly, the Court DENIES the Motion as to the IFCA claim.

The Court also rejects USAA's argument that Graling's IFCA notice precludes him from seeking anything other than medical specials. The IFCA notice requirement requires a first party claimant to "provide written notice of the basis for the cause of action to the insurer and office of the insurance commissioner" twenty days before filing the action. RCW 48.30.015. Courts have held "IFCA's pre-suit notice provision is a mandatory condition precedent to an IFCA lawsuit." MKB Constructors v. Am. Zurich Ins. Co., 49 F. Supp. 3d 814, 840 (W.D. Wash. 2014); Dolsen Companies v. Bedivere Ins. Co., No. 1:16-CV-3141-TOR, 2018 WL 3603059, at *3 (E.D. Wash. May 16, 2018). "Notably, the IFCA notice form does not require the insured to identify the specific benefits sought, but rather only requires the insured to identify the policy (or policies) at issue and the legal basis for the alleged violations." Dolsen, 2018 WL 3603059, at *3. Here, the notice adequately identified the policy at issue and the legal basis for the alleged violations, even if the settlement demand was based exclusively on the medical specials.

Lastly, the Court agrees with USAA that under IFCA the costs incurred by hiring two experts to litigate this case are not recoverable under the Act. IFCA "plainly differentiates between 'actual damages' and 'reasonable attorneys' fees and litigation costs.'" Bauman v. Am. Com. Ins. Co., No. C15-1909 BJR, 2017 WL 44439, at *3 (W.D. Wash. Jan. 4, 2017) (quoting RCW 48.30.015(1)). Applied here, this prevents Graling from recovering costs incurred by his two experts. But Graling has shown actual damages in dispute as to whether he was owed more in UIM benefits.

**D.    CPA**

Graling has identified disputed material facts concerning his CPA claim that preclude summary judgment.

"To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 37 (2009) (citing Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784 (1986)). "The CPA is to be 'liberally construed that its beneficial purposes may be served.'" Panag, 166 Wn.2d at 37 (quoting RCW 19.86.920). "The violation of a WAC 284–30–330 subsection establishes a breach of duty." Am. Manufacturers Mut. Ins. Co. v. Osborn, 104 Wn. App. 686, 697–98 (2001). "But, unlike the injury in the CPA claim, the injury alleged need not be economic and may include emotional distress or personal injury." Id. (citing Coventry, 136 Wn.2d at 284).

Graling has identified sufficient facts in dispute about whether USAA violated the CPA. Notably, the same facts concerning Menchaca's weak investigation of general damages supports Graling's argument that USAA violated WAC 284-30-330 and violated the CPA. And here,

damages under the CPA include noneconomic damages, which Graling has sufficiently supported. And to the extent that Graling can show that the expert fees he incurred were to "investigate the claim" and not merely to litigate it, they may also be "recoverable as actual damages." Peoples v. United Servs. Auto. Ass'n, 194 Wn.2d 771, 782 (2019). That specific issue, however, will need to be resolved at trial. For these reasons, the Court DENIES the Motion as to this claim.

### E. Breach of Contract

For the same reasons as identified above, Graling's breach of contract claim must proceed to trial to allow a jury to determine whether USAA's below-limits offer and evaluation of the claim constitutes a breach of the duty to fairly pay benefits under the insuring contract. For these reasons, the Court DENIES the Motion as to this claim.

### F. Negligence and Intentional Infliction of Emotional Distress

Graling agrees that his negligence and intentional infliction of emotional distress claims should be dismissed. (Pl. Opp. at 20-21.) The Court therefore GRANTS the Motion as to these claims, and notes that this does not bar Graling ability to obtain noneconomic damages.

## II. MOTION TO EXCLUDE EXPERTS

### A. Dr. Hamilton

USAA seeks to exclude Dr. Hamilton's opinions on whether Graling could have worked at Amazon during the summer of 2024. The Court agrees with USAA that Dr. Hamilton's opinion must be constrained by what he actually observed in his treatment of Graling. Dr. Hamilton's written report concerning the Amazon job appears to be based entirely on Graling's subjective beliefs about his physical abilities and undisclosed job-related lifting requirements. Dr. Hamilton admits his opinion is based only on Graling's deposition testimony, which the

1   Court finds is far too vague to permit Dr. Hamilton to opine on whether Graling could or should
2   have worked at Amazon in the summer of 2024. On this basis, the Court GRANTS the Motion.
3   However, Dr. Hamilton may be allowed to testify as to whether he believed Graling faced any
4   restrictions at the time he last saw him for treatment in June 2024.

**B.  Rob Dietz**

USAA asks the Court to exclude a variety of portions of Rob Dietz's opinions, which are almost all issues that can be resolved through motions in limine or at trial. The Court reviews the issues and notes that it has not considered Dietz's opinions in resolving the Motion for Summary Judgment, as they were not necessary to reach in finding a basis for denial.

First, USAA complains about the "general lack of substance supporting Mr. Dietz's opinions." (Dkt. No. 20 at 4.) But this is too vague a complaint to be actionable as a matter of exclusion. The Court thus DENIES this overbroad request.

Second, USAA asks the Court to exclude Dietz's opinions about whether USAA acted promptly. The Court finds no merit in this argument, as framed. Dietz has personal experience as an adjuster about how quickly an insurer should respond to a demand, and the response times here are a matter of verifiable fact. The Court sees no basis to exclude Dietz's opinions on timeliness to the extent they are based on his experience and the facts specific to this case. Accordingly, the Court DENIES this request. To the extent that Dietz opines on issues of law or on ultimate issues, USAA may, of course, raise objections as they arise at trial.

Third, USAA asks the Court to exclude Dietz's opinions about whether USAA had "ample supports for wage loss." (Mot. at 5 (citing Dkt. No. 21-1 at 25).) In his deposition, Dietz walked back this statement as to the Amazon job. (Dietz Dep. at 83 (Dkt. No. 21-3).) But the

statement may well be reasonable or applicable as to the Aequor work. The Court therefore declines to exclude his testimony and DENIES this request without prejudice.

Fourth, USAA asks the Court to exclude Dietz's testimony to the extent he relies on information from other cases involving USAA and to limit Dietz's opinions about what the adjuster in this case did. (Mot. at 5.) The Court here is sympathetic to USAA's argument, but if Dietz has specific knowledge about what other USAA adjusters did in other cases that has some relevance here, he should be able to explain what happened. At this juncture, however, the Court cannot know what those statements or opinions might be, and that context is necessary to resolve any dispute. At this state of the proceedings, the Court DENIES this request without prejudice, and will resolve any dispute, if it arises, at trial.

Fifth, USAA complains that Dietz admits his opinions are based not just on his experience, but on other USAA testimony he has heard or witnessed. (Mot. at 6.)Without knowing what specific opinion Dietz is offering, however, the Court cannot resolve this dispute. The Court therefore DENIES this request without prejudice, and will resolve any dispute, if it arises, at trial.

Sixth, USAA seeks to exclude Dietz's opinions about the propriety of the third-party medical reviewer's reduction of the medical specials because it is based on other cases and findings concerning a class action about these kinds of reductions. Graling argues that Dietz may rely on admissions of a party opponent to support his claim under Fed. R. Evid. 801(d)(2). This is true, but it is unclear from Dietz's testimony what exactly it is on which he relies. The Court will resolve this dispute at trial, should it arise, but cannot rule on the record presented. Accordingly, the Court DENY this request without prejudice.

1    Seventh, USAA seeks to exclude any of Dietz's testimony based on "protected" documents that Dietz obtained in other litigation that are subject to a protective order. This appears a valid criticism, but the Court has not been provided with any specific documents or testimony to exclude. To the extent Dietz is relying on materials subject to other protective orders, he cannot use them to support his opinions. But if he is basing his opinion on materials produced in this case, he should be permitted. Accordingly, the Court DENIES this request without prejudice and will resolve the issue if and when it arises at trial.

Eighth, USAA asks the Court to exclude any of Dietz' opinions concerning reasonableness, on the theory that this invades an ultimate issue for the jury. The Court agrees in part. Because reasonableness is an element of at least some of the claims, Dietz could confuse the jury if he speaks in general terms about reasonableness. To protect against this, Dietz must constrain his testimony to whether he believes certain acts meet or don't meet industry standards. On this basis, the Court GRANTS in part the request.

## CONCLUSION

Though Graling has not identified particularly compelling evidence to support his claims, he has presented disputes of fact that preclude summary judgment on all but his negligence claims. At trial, Graling will face a challenge in convincing a jury that his claims have merit and that USAA's refusal to pay the additional $9,000 was unreasonable and that it engaged in misconduct. But given the record presented to the Court and the applicable standard, the Court DENIES the Motion for Summary Judgment except as to the negligence claims on which summary judgment is GRANTED.

The Court finds merit in several aspects of USAA's Motion to Exclude, as outlined above. But it finds that many of the disputes must be resolved either through motions in limine or

1  at trial where specific testimony and context can be laid out and discussed in greater detail.

2  Accordingly, the Court GRANTS in part and DENIES in part the Motion to Exclude.

3      The clerk is ordered to provide copies of this order to all counsel.

4      Dated October 21, 2025.

                                                  Marsha J. Pechman
                                                  United States Senior District Judge